GLADYS M. KENNEDY, et al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Kennedy v. Commissioner
Docket Nos. 4757-71, 6264-71, 6265-71, 6266-71, 6267-71, 6268-71, 7467-71.
United States Tax Court
T.C. Memo 1974-149; 1974 Tax Ct. Memo LEXIS 169; 33 T.C.M. (CCH) 655; T.C.M. (RIA) 74149; June 11, 1974, Filed. Robert M. Wheatley, Anthony M. Kennedy, and Anthony J. Scalora, for the petitioners. Randall G. Dick and Edward B. Simpson, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Deficiency Determined Petitioner
1964
1966
1967
1968 Gladys M. Kennedy
--
$ 204.00
--
$ 187.00
Anthony and Marian Scalora
--
$ 71.00
$2,054.00
$1,652.00
Joyce Feldstein
--
$ 632.00
$1,260.00
$2,149.00
Harry M. Tonkin
--
$2,592.00
$3,129.00
$3,405.00
Paul H. and Lila Guttman
--
--
$1,693.00
$1,829.00
Joseph and Celia Borges [1]
$2,093.51
$ 547.81
--
$1,001.64
Dalton Feldstein
--
$ 632.00
$1,261.00
$2,135.00
*171 The issue for decision is whether the "passive investment income," as defined in section 1372(e) (5) (c), [2] of Freeport Development Company exceeded 20 percent of its gross income during any one of its fiscal years ending Cotober 31, 1966, 1967, and 1968, thereby terminating its election to be taxed under the provisions of subchapter S (sections 1371 through 1379). [3] This issue rests in turn upon (1) whether the payments received by Freeport Development Company under a sharecrop arrangement constituted "rents" and (2) whether payments received for the sale of topsoil, where the contract did not require a certain amount of dirt to be removed, constituted "royalties," within the meaning of section 1372(e) (5) (C). *172 FINDINGS OF FACT All the petitioners were legal residents of California at the time their respective petitions were filed. During 1965 through 1968, all were shareholders of Freeport Development Company (hereinafter Freeport). During each of the years in controversy, Freeport's stock was owned as follows: Dalton and Joyce Feldstein
87 shares
Harry M. Tonkin
87 shares
Joseph and Celia Borges
43-1/2 shares
Anthony J. and Marian Scalora
43-1/2 shares
Paul H. and Lila Guttman
43-1/2 shares
Gladys M. Kennedy
43-1/2 shares
Freeport was incorporated on December 14, 1954, and commenced operations during 1955. On October 28, 1955, it acquired a 257-acre ranch near Sacramento, California. At the time of acquisition, the ranch was farmed by petitioner Joseph Borges (hereinafter Borges) under an existing sharecrop lease with its former owners. This lease was scheduled to expire on December 31, 1967. Pursuant to an agreement between Borges, as lessee, and Freeport, Borges was to be given $5,000 worth of Freeport stock, when issued, for either canceling or orally promising to cancel the lease. In August 1960, Borges became a shareholder in Freeport. *173 In October 1960, Borges and Freeport entered into a new lease of the ranch for a period of seven years commencing January 1, 1961, and ending December 31, 1967. Under the terms of the lease, Borges, as lessee, continued to farm the land and pay Freeport specified percentages of labor. These expenses were borne solely by Borges. The Federal income tax returns filed on behalf of Freeport for its fiscal years 1965 through 1968 disclose no expenditures directly related to farming activities and show as income only its share of net crop proceeds. The minutes of a special meeting of Freeport's board of directors held on July 2, 1964, include the following: Mr. Borges reviewed for the Directors the farming operations that he carries on for the Corporation. The Directors found his report to be satisfactory. At the suggestion of Mr. Kennedy, [4] the following resolution was adopted: Whereas, the Directors have reviewed the acts of the Officers of the Corporation and its transactions conducted by its officers and attorneys during the past year, and said review being satisfactory it is hereby resolved that all actions of the officers, directors and attorneys of the Corporation *174 be and they hereby are ratified and approved. Similar entries appear in minutes for the meetings of October 26, 1965, July 18, 1966, and September 25, 1968. Borges was approached by representatives of the Kuchenberg Construction Company (hereinafter Kuckenberg) who wished to purchase some dirt to build a levee. Since Freeport had some hilly land that would benefit from leveling and grading, Borges negotiated a sale of the dirt, subject to the approval of Freeport's board of directors. On August 23, 1965, Freeport and Kuckenberg entered into an agreement for the sale of topsoil which contained the following paragraphs: * * * Seller [Freeport] agrees to sell, and Buyer [Kuckenberg] agrees to buy, a minimum of 70,000 cubic yards and a maximum of 130,000 cubic yards of top soil at the following price: (a) The price for the first 70,000 yards of top soil shall be the price of 20" per cubic yard or a total minimum price of $14,000.00.This minimum price shall be paid by Seller to Buyer [sic] whether or not the amount of soil removed *175 by Buyer shall equal 70,000 cubic yards. (b) The price for any soil removed in excess of 70,000 cubic yards (but not to exceed the maximum provided above) shall be 15" per cubic yard. * * * Payment for soil shall be made as follows: (a) $14,000.00 shall be paid to Seller on or before September 30, 1965, or on the date that Krpan Bros., as general contractor, shall certify that Buyer's contract has been completed, whichever date is the sooner to occur. (b) The balance, if any, of the purchase price for soil removed, shall be paid as soon as it is practicable for Spink Engineering Company to determine the total amount of soil removed by Buyer but in no event later than March 15, 1966. During 1965, Kuckenberg completed removal of the topsoil pursuant to its contract with Freeport and tendered payment in the minimum amount of $14,000 in full payment. Subsequently, engineers retained by Freeport determined that 73,388 cubic yards of topsoil were removed, and Kuckenberg paid Freeport an additional $508.20. These engineers also determined that the topsoil removal had been accomplished according to the grading plans submitted to Kuckenberg. During its fiscal years ending *176 October 31, 1965, through October 31, 1968, Freeport had gross receipts, derived from farming activities, as follows: 1965
$5,370
1966
$6,061
1967
$ 261
1968
$9,267
It had no other gross receipts during these years except the $14,508.20 received in its fiscal year ending October 31, 1965, from the sale of topsoil, which it reported as ordinary income. In his statutory notices to petitioners, respondent determined that Freeport's passive investment income exceeded 20 percent of its gross income for its fiscal years ending October 31, 1965 through 1968, thereby terminating its election under section 1372. Accordingly, the losses claimed by petitioners for these years from Freeport were disallowed. OPINION An election by a corporation, under section 1372, to be treated as a subchapter S corporation terminates, under section 1372(e) (5), if, in any taxable year, more than 20 percent of its gross receipts constitutes passive investment income. The term "passive investment income" includes gross receipts derived from "rents" [5] or "royalties." [6]
*177 Respondent maintains that Freeport's share of the crops grown on its land was rent and that its receipts from the topsoil sales to Kuckenberg were rayalties within the meaning of section 1372(e) (5). Since Freeport had no gross receipts of any other kind, respondent urges that Freeport's election of subchapter S status terminated in the taxable year ending October 31, 1965, and was, therefore, ineffective for all subsequent years in controversy. Petitioners deny that either the sharecrop income or the topsoil sales proceeds were passive investment income and maintain that the subchapter S election did not terminate. We are compelled to hold for respondent. The owner of farmland and the operator of the farm are, of course, free to work out any kind of contract they choose for the management of the farm. In the instant case, the oral contract between Freeport and Borges called for a sharing of the proceeds of the crops grown on Freeport's land. Such a crop-sharing arrangement may create a landlord-tenant relationship, an employer-employee relationship, a partnership, or a joint venture. United States v. Myra Foundation, 382 F.2d 107, 110 (C.A. 8, 1967). The kind *178 of relationship which is created depends upon the terms of the contract between the parties and the manner in which it is carried out, and, within any one such type of relationship, the terms of the agreement may vary widely. In deciding what kind of relationship is created, the facts of the case, therefore, must be examined with great care. As we interpret petitioners' position, they contend that beginning with Freeport's election to become a subchapter S corporation, the farm lease with Borges was canceled and he became Freeport's employee in managing the farm's operation. Borges had farmed the land as a tenant for many years, and this relationship was allegedly a new one. While the record shows that the board of directors was informed that the corporation would be required to engage actively in the conduct of the farm in order to qualify for subchapter S status, we do not think the corporation actually did so. An examination of Freeport's income tax return for its taxable years ending October 31, 1965, 1966, 1967, and 1968 does not reflect that Freeport operated the 257-acre farm. The return for the fiscal year ended in 1965, for example, shows gross receipts of $5,370, *179 evidently from crop shares, and other income of $14,508 from the sale of topsoil.The only deductions claimed were taxes of $12,335, depreciation of $1,628, and legal, auditing, insurance, and engineering fees totaling $2,037. The return reflects no expenditures by Freeport for labor, seed, fertilizer, planting, cultivation, insecticides, harvesting, or other items normally incurred by a farm operator growing the crops cultivated on the farm - corn, milo, safflower, barley, wheat, sugar beets, and tomatoes. The record shows that it was Borges who paid all the expenses, bought the seed, hired the labor, supervised the cultivation, harvested the crops, and arranged to have a share of the crops' proceeds paid to Freeport. If Borges had been an employee operating the farm for the corporation, Freeport would have reported the total amount realized on the sale of the crops, not just its net share, and would have deducted the expenses. But Borges received all the crop income, paid Freeport its share, and paid the expenses as he did while he was concededly a tenant and Freeport his landlord. Borges farmed other land on a crop share basis, and it is stipulated that "Payments to Freeport *180 Development Company from Mr. Borges were based on percentage payments substantially equivalent in amount to payments that would be made under a sharecrop lease." Indeed, on cross examination, Borges was asked for the details of his arrangement with Freeport, and he then testified: Q. Now, does that differ from any other sharecrop lease that you had on any of the other properties you were farming at that time? A. No, it's run practically the same. * * * Petitioners maintain that Borges was elected president of Freeport when the subchapter S election was made and that all his subsequent activities in managing the farm were performed on behalf of the corporation. It may not be possible to neatly segregate all of Borges' activities as sharecrop-tenant from those activities which he carried on as a director and president of Freeport. However, he received no salary from Freeport. His only earnings from running the farm were his share of the crops. Since he paid all the expenses and received only a share of the crops, he bore virtually all the risk of loss in case of a crop failure. This risk-taking is characteristic of a tenant-entrepreneur rather than an employee. It is *181 characteristic of a sharecrop arrangement rather than an employment arrangement (where the corporation ordinarily would have borne all the expenses) or a joint venture (where the expenses would have been shared). Petitioners insist that, prior to the subchapter S election, Borges did not consult Freeport as to what crops were grown but that he did so after the election was made. One of the members of the board of directors admitted, however, that none of them, except Borges, knew anything about farming, and Borges testified: Q. Now, can you advise me, in the duties that you would perform as president of the corporation, did you make a choice and discuss with the Board of Directors the type of crops that would be placed upon the various pieces of ground held by the Freeport Development Corporation? A. Well, it was supposed to have been discussed with the directors, but there was times when they told me just to go ahead, and they left me go ahead as I wanted to on planting the crops, but I usually discussed it with one or two of the directors. It is not unusual, of course, for the owner of land to specify the crops to be grown on it by his tenant-sharecropper or at least *182 to negotiate the matter with his tenant. Such control by a landlord may be necessary to assure rotation of the crops as a soil conservation measure and to provide for efficient diversification to protect the landowner's crop share income. As we view the evidence, when the subchapter S election was made, the relationship between Freeport and Borges was not converted to that of an employer-employee. Freeport continued to be a landlord, and the crop shares which it received continued to represent rent within the meaning of section 1372(e) (5). As shown by our Findings of Fact, the minutes of the annual meetings of Freeport's board of directors reflect that a general report was made by the officers, including Borges, on the activities of the corporation and the board ratified these acts. However, such formalities are not sufficient to show that new relationship was created. Nor has petitioner shown that Freeport was actively engaged in the conduct of the farming business. There is no showing that the corporation participated to any material degree in the operation of the farm; it made no management decisions, furnished no supplies or services, [7] and paid none of the farm expenses. *183 Petitioners point out that, in 1965, Freeport withdrew some of the land from farming so that the topsoil could be sold and yet Borges was not compensated for the use of the land. But the evidence is that the seven-year lease of October 30, 1960, was canceled when the subchapter S election was made. Thereafter, Freeport and Borges had no written agreement. Borges thus rented the land on a year-to-year basis, and he and Freeport were free to agree each year how much of the land and on what terms it would be farmed. Borges had no claim for reimbursement merely because Freeport decided not to lease all the land to be farmed during 1965. Petitioners next argue that a landlord-tenant relationship involves an interest in land and a contract effectuating such a relationship will not be implied "where the acts and conduct of the parties negate its existence." We do not question the correctness of this statement of the law. Nor do we intend to hold that a landlord-tenant relationship is implied from the facts in this case. Rather, we hold that the facts here show that such relationship was created by the agreement and conduct *184 of the parties - Freeport's furnishing nothing except the use of the land and receiving a crop share and Borges' furnishing all the management, labor, supplies, etc., and receiving all the proceeds of the crops not turned over to Freeport, on substantially the same terms and in the same manner as during the period when a landlord-tenant relationship admittedly existed. A farm operator and a landowner cannot create a landlord-tenant relationship and then avoid the consequences of that relationship by calling it something else. Having concluded that the income from the farm was rent within the meaning of section 1372(e) (5), we need not make a decision as to whether the proceeds from the sale of topsoil constituted royalties within the meaning of section 1372(e) (5). The parties have agreed that if either the sharecrop proceeds or the topsoil sale proceeds were passive investment income, the corporation is disqualified from subchapter S status. To reflect the foregoing. Decision will be entered for the respondent. Footnotes
1. The following cases are consolidated herewith: Gladys M. Kennedy, docket No. 4757-71; Anthony Scalora and Marian Scalora, docket No. 6264-71; Joyce Feldstein, docket No. 6265-71; Harry M. Tonkin, docket No. 6266-71; Paul H. Guttman and Lila Guttman, docket No. 6267-71; Joseph Borges and Celia Borges, docket No. 6268-71; and Dalton Feldstein, docket No. 7467-71. ↩
1. The deficiency for 1964 resulted from the disallowance of a net operating loss carryback from 1967. ↩
2. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted. ↩
3. Prior to amendment, effective for taxable years of electing small business corporations ending after April 14, 1966, sec. 1372(e) (5) did not use the term "passive investment income"; the term "personal holding company income" was used instead. For the sake of simplicity, and since the result here is the same under both versions, we will use the term "passive investment income" throughout. ↩
4. This statement as to "Mr. Kennedy" apparently refers to Anthony M. Kennedy, the son of Anthony J. Kennedy (who died on Nov. 7, 1963). ↩
5. Sec. 1.1372-4(b) (5) (vi), Income Tax Regs.↩, defines the term "rents," as used in sec. 1372(e) (5) to mean "amounts received for the use of, or right to use, property (whether real or personal) of the corporation." 6. See sec. 1.1372-4(b) (5) (v), Income Tax Regs.↩
7. See Rev. Rul. 61-112, 1961-1 C.B. 399↩.